Good morning, Your Honors. My name is Richard Clegg. I'm counsel for the Appellant Kim Ship in the District Court of Law. At this court, there are two issues that we've raised on appeal in connection with the District Court's grant of summary judgment of non-infringement in favor of the defendant and FLE Ice Marine. One of the issues is a claim construction issue that goes to the patent and the patent law. The other issue is, as we say, a primarily evidentiary issue that goes to the District Court's failure, in our view, to give any substantive consideration to our primary evidence of infringement. That's the dealing with substantially perpendicular but where? That is correct. That's the claim construction issue, which I should begin by saying is not a dispositive issue for us from a claim construction viewpoint. We don't agree with the claim construction, but if we had to, we could go to trial with the evidence that we presented to the District Court on summary judgment, and we could prevail on infringement. But the patent would be burdened with a claim construction that would affect its viability and its value down the road. So we raise that issue of appeal, even though it's not dispositive in this particular case with this particular accused product. Now, I take it that you've at least got some inkling of the idea of the technology issue here, but I'll give you a minute overview. And by the way, I'd like to reserve a few minutes for rebuttal if I may. Can you say this is not dispositive? Where's the rest of the case now? Well, the case has been disposed of. Final judgment has been entered. But the claim construction issue, the error that we contend the District Court committed with respect to claim construction, would not have ended the case for us. We could prevail in this case with this accused product, with the claim construction as it stands. You're arguing non-infringement. There was summary judgment of non-infringement. There was summary judgment of non-infringement. So we're appealing the summary judgment, including the claim construction and the infringement. So the essence of what you're saying is even if we disagree with you on claim construction, we can still be versed on the non-infringement? That's exactly right. And that is because you think the photographs that you submitted were adequate. That's exactly right. That's exactly right. So the gist of the claim construction issue went to one element of the claim. That was the base of the summary judgment ruling. There's a lot of elements in these claims. But in general, you're dealing with a water shaft. It has what the claims refer to as a central displacement body. And then apart from the displacement body, there are first and second outer wings that are connected to it by — I'm sorry, skirts that are connected by wings that extend between the displacement body and the skirts. The summary judgment motion and issues that we've raised on appeal go specifically to the shape of the outer surface of the outer skirts. Okay? So it doesn't involve the overall design of the craft, but just goes to that specific part of the claim. Now, Judge Cole, the district court judge, had a markman hearing for two days in July of 2007, considered everything fully. And with respect to the skirt limitation of the claims, the primary issue was what it means when the claims say that the outer surfaces of the outer skirts are substantially perpendicular with respect to the waterline. Now, Judge Cole ultimately interpreted that limitation of the claim to mean — and I'm going to refer you, of course, to his ruling — but the language was, in effect, that the outer skirts have outer surfaces that are substantially perpendicular with respect to the static waterline in order to minimize wave generation. Now, the minimizing wave generation language was not anywhere in the claims, and the — But it was clearly in the suppression of wave generation. Well — That's the reason for that limitation. Well, perhaps. There was a lot of discussion in this patent of suppressing wave generation, but that discussion was in the context of trapping the bow wave coming off the central portion in the channels that are formed between the central body and the skirts. There's no discussion of reducing lateral wave generation off of the outer surface of the skirts. You mean the skirt of the issue. I'm sorry? You mean the skirt of the issue. Yes, yes, the skirt of the issue. So the discussion in the patent is all about minimizing or cutting off this bow wave that gets thrown off the main central portion of the boat by gobbling it up into these channels between the skirts and the central displacement portion. Now, Judge Gold, in his claim construction ruling, got a little bit sideways on that issue because he interpreted the substantial perpendicularity requirement in terms of preventing wave generation off of the side of the skirt, which really was not discussed in the patent at all. Now, this language substantially — It talks about having substantially perpendicular outer surfaces in order to minimize wave generation, but it doesn't say wave generation from the outer surface of the skirt. Now, I know that it's easy to think that at first, but if you look at where that language was added into the claims during the prosecution history, it actually gives a very different flavor of what was happening there. The substantially perpendicular language was added to Claim 1 as one of the amendments to overcome an objection based on the Tavern reference. And the statement, the remarks that were made accompanying that amendment are as follows, and this is at page 8368 of the joint appendix. The outer skirt structures of the applicants' invention are generally flat, vertical, and parallel below the static waterline in order to capture bow waves and direct them into the first and second channels. So here, we're talking about the shape of the outer surfaces of the outer skirts, but in the context of their function of steering waves into the channel. It's not talking about what happens about waves coming off of the side skirts. Then it says, follows up, saying the specification states that they, quote, are substantially perpendicular with respect to the static waterline to minimize wave generation. Paragraph beginning on page 5, line 13. That's the statement that you referred to, Judge Lori. But here again, in the prosecution, that statement was expanded, and it was clear that we're talking about minimizing wave generation from the bow by taking the bow wave into the channel. Okay. So Judge Gold put into the claim construction this requirement, kind of a functional reason for having the structures be substantially perpendicular to minimize wave generation. He didn't say what kind of wave generation or where the waves are being generated from. Okay. Now, that was the claim construction ruling. We lived with it for a year, and then the defendant files a motion for summary judgment. And in the motion for summary judgment, they argue for the first time that you have to focus on the perpendicularity of the skirt where it enters the water because that's going to affect this generation off of the skirt or lateral wave. So what happened is we had this morphing of the claim language. First go around, the judge interpreted the claim by putting in this functional desired result of having substantially perpendicular out of the walls. And then in the summary judgment context, he used that language about minimizing wave generation to bootstrap in another limitation in the claim by saying, well, if you're going to minimize wave generation, you have to focus on perpendicularity at the point where the water intersects the skirt. Well, the claim says with respect to the static water. It says with respect to the static water line. Judge Gold interpreted it to say at the water line. It has to be perpendicular at the water line, not perpendicular with respect to the water line. I can point to a portion of the ceiling or the walls in this courtroom and say that wall panel at the top is perpendicular with respect to the floor. That's a very different thing than saying it is perpendicular at the floor because that implies that there's an intersection between the two. Here we're just talking about the general overall shape of the outer surface of this boat. And we went from having a claim that just says, look, the outer surfaces of the outer skirts are generally or substantially perpendicular to a requirement on summary judgment that said you've got to have a perpendicular outer surface at the point where it intersects the wall. Let me take you just before your time runs out. Yes. What I think you were saying at the beginning, which is let's assume we adopt a quick district courts claim construction. Yes. Is your view that the Blade Runner boats aren't, we don't look at them for measuring it at the generalized angle? No. I'm having a hard time figuring out how under this claim construction, your view is that there's no chance of a reaction summary judgment. Under Judge Gold's claim construction, you look at where the water is intersecting the outer surface of the hull. Now, what Ice Marine presented was their version of how their boat, how they intend it to operate, which is this fast boat sort of skimming across the water, this theoretically glass smooth water, just barely touching and not going into the water at all. And that's what they present in terms of their vision of how the boat operates. We have photographs that come from their own promotional materials which show the boat loaded down with people and actually going in the water much, much deeper in the water. So we have photographs that show the water actually intersecting the side of their boat above the deck rise portion that they rely upon. What they've got is a boat that is flat, flat, flat, flat, flat, flat, and at the very, very bottom, it juts in. And their theory is that, ah, that's where the design waterline is and it's not exactly flat. So they want to drive analysis down at the very, very bottom. It's not even close to perpendicular. It's not close to perpendicular if you say 90 degrees. But if you look at the context in which that substantial perpendicular language was added into the claims, I think we could argue that it's still substantially perpendicular. Yes, we have. We have. So. Okay. Thank you. Thank you. May it please the court, my name is Pascoe. I'm a representative of Ice Marine. I must say that I was surprised to hear Mr. Clegg say that the outside surfaces of the struts are not there. Their substantial perpendicularity is not there to affect wave generation. Excuse me. You're not saying he waived that argument. I think he did, actually. Um, at the Markman hearing, at page, um, at the Markman brief, at page, I think 41 of the appendix, Mr. Clegg, or M. Schiff, argued that if the outer surfaces of the skirts are tilted too much relative to the water surface, lateral waves will be created. He goes on to say in that brief, the outer surfaces of the skirts are generally, but not necessarily precisely, perpendicular to the water, sufficient to avoid substantial additional wave generation from the side skirts. He's telling the court, these skirts are perpendicular to the water, so that the skirts do not create waves, battle waves. In the part of the briefing and the arguments by Mr. Barry, their expert witness, who reports to look at all these photographs, Mr. Barry says, well, those skirts are substantially perpendicular because they don't cause waves. The whole purpose of the substantial perpendicularity was to avoid the formation of waves. Yes, the tunnels collect waves with the bow of the center part. They do not create their own waves according to the convention. I think the answer to this issue is to look at the file history. Claim one is originally filed. It didn't have this claim limitation. And the examiner cited the title reference. And the title reference, according to, this is at appendix 163. The title reference has, as described in the patent, vertical sides, 33, and keel-like portions, 11B. In rejecting original claim one, under 102, the examiner said, Tatter has skirts, 11B. Those skirts, according to Emsham, have a dead rise of 45 degrees. Naturally, in the context of the motion for summary judgment, Mr. Campbell, the designer of the boat, at, I think it's appendix page 8, 1499, took some measurements off the patent to confirm that Mr. Munn's testimony at the marking hearing that Tatter had a 45-degree dead rise was correct. And the patent clearly shows that that dead rise goes from the keel to the substantially vertical portions, 33. They amended the claim to say that the outer surfaces of the skirts were substantially perpendicular. Obviously, that was done to overcome the title reference. To distinguish the claim, the invention, from Tatter, by saying that those skirts had vertically, substantially perpendicular sides. What, in your view, is the range, therefore, substantial? I think substantially perpendicular would, well, let me answer it a little bit differently. I think they gave up, when they amended the claim, whatever is disclosed in Tatter. Tatter discloses that the dead rise varies from 45 degrees, all the way up to where Tatter says they have substantially vertical sidings. Campbell measures that at 80 degrees. So it varies from 40 to 80 degrees. Substantially vertical, to me, therefore, is 80 to 90 degrees. Substantially perpendicular is 80 to 90 degrees. There is a reference that was cited. It's in the appendix. It's the Paxton reference, prior art reference. It shows a very similar boat. It has skirts, what we say are skirts, and vertical sidewalls. His invention, also, was to capture boundaries from the center hull and to reduce the production of waves by the boat. This was a pilot boat that was used to go up against big ships as they were bringing it into the harbor to let the pilot jump over onto the big ship. He wanted to prevent formation of waves that would bounce the pilot boat away from the main boat. He has vertical sidewalls, and he says, for eliminating waves, he says that they can vary from 0 to 10 degrees, which is exactly what Tatter has. So I say, and I believe the district court concluded, that substantially perpendicular is perpendicular, but not exactly perpendicular. And I think the 10 degree range, based on the prior art, is appropriate. In any event, the maximum variance on the accused boat is 67 degrees, as measured by Mr. Campbell, and which is undisputed by the plaintiffs in this case. 67 degrees is further away from 90 degrees than 45 degrees. So our dead rises are closer to what they admit Tatter should have said. I thought the evidence was that the dead rise angle was between 90 degrees and 67 degrees. Yes, it varies. It varies from boat to boat. There are basically two different kinds of accused boats, and the dead rise varies somewhat between the boats. What is your response to the other side's argument, not with respect to point construction, but to non-infringement, and the fact that these photographs demonstrated that the way the members of the pilot boat moved water is what you and Dr. Campbell have suggested. Why isn't that a sufficient statement? Well, for two reasons, but the principle reason is that the photographs, as they say, speak for themselves, but they only speak for what a reasonable person can make a reasonable judgment on what's shown. The testimony from the designer, eyewitnesses, the designer, and the builder of the boats who wrote those books, and were there when the pictures were taken, describe how they operate. They claim, they testify that they operate at the static waterline and in operation. The waterline is at the dead rise portions. That's not disputed. You can look at those photographs, and without an explanation from someone who is knowledgeable about how the boat is operating, what conditions are being shown in the boat, and you can't tell how fast those boats are moving. Some of them look like they're going fast. Some of them look like they're going slowly. You don't know what the speeds are. Mr. Watts explained what is going on in those boats, and explains that you can't see where, given the nature of the photographs, where the water is in the sea. They haven't heard the proof of the infringement. They should have come forward with evidence. In those photographs, Your Honor, there are... We're talking about summary judgment here, right? Well, but they should have come forward to me, but the claims, the testimony of Watts and Campbell about where the boat intersects the water, and they came forward with photographs... All I have to show is that there's some disputed fact. But no one has testified that there's a disputed fact. These are the statements that were made, were statements of counsel as to what he thinks the pictures show, and statements, a conclusory statement of Mr. Barry, their expert witness, who never discusses where the surface of the water intersects the accused boats. The other reason I don't think these photographs are of much value is there are four boats shown in those photographs, three pictures with the red blade runner in it, and one with the blue blade runner in it that is on blocks in the shipyard. The blue blade runner is a boat that was made, used, and sold in this country. But the picture of the boat on the blocks tells you nothing about where it's in the water. It's on a perspective. You can't really tell from the photograph what the dimensions are. They have never mentioned it, and they don't challenge our measurements of those dimensions. The other three boats, according to the affidavit of Mr. Watts, were not made, used, or sold in this country. Those pictures were taken of other blue blade runner boats made by the same design, made with the same general design. But they're not boats that are involved in this lawsuit personally. They're irrelevant, but they are, we admit they were the same design, but our position is that you can't from the photographs alone just say, here are some photographs, and I, as the attorney, interpret them. That's not evidence that rebuts the testimony of witnesses and experts. I think that actually addresses the two main points at issue here, unless there are additional questions. Thank you. Thank you. Just a few points that I'd like to add. First, the declarations of Mr. Watts and Mr. Campbell were filed as supplemental declarations after we filed our opposition to the summary judgment motion in the district court level. So we didn't have an opportunity to come in and rebut those supplemental declarations. Mr. Watts had not submitted any declaration in support of the motion, and his declaration came after we had already filed our opposition and said what we had to say in opposition to the motion. Now, on the subject of arguments that we made in the Markman briefs a couple years ago about the suppression of lateral waves from the sides of the skirts, to be sure, the shape of the outer surface of the craft is something that there are preferred approaches to it, and the only statement in the patent about having substantially perpendicular outer surfaces to minimize wave generation is made with respect to a preferred embodiment. But the only discussion in the prosecution history, the only discussion of any detail as to why that amendment was added was described in the context of minimizing bow wave generation by capturing the bow waves into the channel. Now, Mr. Watts and Mr. Campbell, the designer of the boat and the owner of the defendant company, have their views and they have their testimony in the record about how they say the boat operates. And Mr. Watts put in a supplemental declaration to explain what was going on in that picture of the boat. And he basically said, well, we decided to look at dolphins and we were going slow, and when the boat goes slow, it goes stern in, down, and bow up. He didn't dispute that that photograph was accurate. He simply said, well, the boat was going slow. Claims aren't limited to any particular mode of operation or any particular speed. And the point that we made in our brief was that a boat that's capable of infringing operation in some modes at some speeds would be an infringement even if it is, at other times, skidding across the water like a water boat, like they say it does all the time. You'll notice that Mr. Watts' declaration is describing the operation of the boat on smooth water at operational speeds. Well, it's a very fast boat and it was designed to go fast. It has set records for going fast. It doesn't always go fast. It doesn't always operate on a glassy pond. It is a real boat that is going at different speeds and different water conditions. We have photographs of the boat going at speeds and in water conditions that are different than what they envision as sort of the ideal way of operating the boat. One other point. The fact that those boats that were photographed were being operated in foreign waters doesn't change the fact that it's the boat that's accused of infringement here. And these laws of physics are the same in the waters of the Mediterranean as they are in San Diego Bay or anywhere else, anywhere else. There's no evidence to the contrary. And I would suggest that the fact that those are their promotional materials. We never actually had an opportunity to inspect the boat in the water. We saw them out in the water and we took photographs. But we took their own photographs and their own promotional materials showing the boats moving into the water. And the fact that the photographs were taken somewhere in the Mediterranean doesn't change the fact that those are photographs showing how those boats really operate. All right. Thank you. Thank you very much. Appreciate you.